E9oereac

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  IN RE APPLICATION OF REAL
    ESTATES INTERNATIONAL,
 4

 5          v.                          14 MISC. 227(DLC)

 6
    ------------------------------x
 7

 8                                      September 23, 2014

 9                                      4:35 p.m.

10
    Before:
11
                        HON. DENISE COTE,
12
                                        District Judge
13
                  APPEARANCES (via telephone)
14
    HELLRING LINDEMAN GOLDSTEIN & SIEGAL, LLP
15        Attorneys for Applicants Real Estates International
    BY:   STEPHEN L. DREYFUSS
16        ROBERT B. ROSEN

17  GOLENBOCK EISEMAN
          Attorneys for Interested Parties: International
18        Geomological Institute, Jerry Ehrenwald, John Li, Kimberly
          Nairn, Carol L. Low and Joseph Low
19  BY:   DAVID J. EISEMAN
          MICHAEL MUNOZ
20

21

22

23

24

25
```

E9oereac

```
 1              (via telephone)
 2              THE COURT:  Good afternoon, counsel.
 3              MR. DREYFUSS:  Good afternoon, your Honor.
 4              MR. EISEMAN:  Good afternoon, Judge.
 5              THE COURT:  I have you on the speakerphone because my
 6    law clerk and a court reporter are with me.
 7              We'll take appearances for REI.
 8              MR. DREYFUSS:  Good afternoon, your Honor.  Hellring,
 9    Lindeman, Goldstein & Siegel, by Stephen L. Dreyfuss and
10    Robert B. Rosen.
11              THE COURT:  Thank you.
12              And for the respondents on this application?
13              MR. EISEMAN:  Your Honor, it's David Eiseman and
14    Michael Munoz from Golenbock, Eiseman, Asor, Bell & Peskoe.
15              THE COURT:  Thanks so much.
16              Remember, gentlemen, please, if I haven't previously
17    instructed you to do so, please identify yourself by name
18    before you speak so that the record is clear here.  And also,
19    please try not to interrupt each other when you speak or
20    interrupt me.  I'll make sure that everybody has a chance to
21    speak before we end this telephone call.
22              I have a letter of September 17th from Mr. Eiseman and
23    a letter of September 19th from Mr. Dreyfuss.  This concerns a
24    request for documents which is attached to the September 19th
25    letter, and I've reviewed the request for documents.  It
```

E9oereac

1    doesn't appear that there's been an adequate meet-and-confer

2    process, so I think maybe if I just give us some parameters to

3    work within and then maybe rule on a couple of the items that

4    you, Mr. Eiseman, are most concerned about, that might give

5    counsel an opportunity to go back and revisit other sections

6    and narrow the disputes here.

7            But generally speaking, I'm going to order production,

8    as I believe I'm required to do so under the applicable legal

9    standards.  And so the question is whether there is undue

10   burden or harassment involved, such that the requests should be

11   narrowed in some particular way.

12           As I understand it, some electronic documents are

13   readily available.  Some hard copy documents are readily, or at

14   least not in long-term storage, but that documents, at least

15   some documents, three years older documents, are stored in a

16   warehouse.  So we may be making distinctions based on

17   accessibility at some point here.

18           There is an October 6th hearing in Luxembourg that is

19   connected or, really, the driver in this application.  And,

20   therefore, ease of access is an issue.

21           So let me start with you, Mr. Eiseman.

22           What do you think is the most outrageous of the

23   requests and the one you'd most like me to focus on?

24           MR. EISEMAN:  Well, I think a few of them are pretty

25   outrageous, your Honor.  But if I may, I would just add to what

E9oereac

1   you said; that obviously there is the issue of the

2   burdensomeness of responding, which is not just the fact that

3   they are in the warehouse but the fact that we've already

4   provided five depositions.  And there's already been a big

5   expenditure of time and a very substantial expenditure of legal

6   fees in connection with this.

7          And so I think the way that we're looking at it -- and

8   I think Rule 45 supports this -- is that there needs to be a

9   relationship between how relevant the information really is to

10  what's going on in Luxembourg and the burden.  It's not just,

11  you know, only, well, what's the burden of doing this and

12  they're entitled to everything else; but I think at this point,

13  after everything we've done and the time that we've taken, that

14  those factors are relevant.

15         But to get to your question, your Honor, I think, you

16  know, if you look at the requests for -- first of all, anything

17  beyond three years is a very big burden for us.  And we would

18  consider that to be outrageous.  I have a little bit more

19  information for you about the warehouse situation.  But

20  anything beyond three years really does increase the burden

21  substantially and is going to take a lot of time to do and a

22  lot of effort and probably substantial amount of money.

23         MR. DREYFUSS:  Just with regard to that, your Honor --

24  Stephen Dreyfuss -- we did have a deposition yesterday --

25         THE COURT:  Excuse me, Mr. Dreyfuss --

E9oereac

1            MR. DREYFUSS:  -- more information about that.  So I

2      want to be heard on that point when Mr. Eiseman is finished.

3            THE COURT:  So, Mr. Dreyfuss, I specifically requested

4      counsel not to interrupt each other.  It's very difficult to

5      conduct these conferences by telephone.  I'll give everyone an

6      opportunity to be heard.

7            Mr. Eiseman, please continue.

8            MR. EISEMAN:  Okay, your Honor.

9            So to answer your question directly, your Honor, I

10     would say right off the bat three of the categories -- you

11     know, understanding that our view is everything beyond three

12     years is burdensome, but the three categories that I think

13     initially stand out are the requests for all documentation

14     underlying consulting fees going back to 2004 for four

15     specified companies.

16           THE COURT:  Okay.  So which one do you want to focus

17     on?

18           MR. EISEMAN:  Well, each one of them asks for the same

19     type of information with respect to four different companies.

20     Three of the companies -- they have particular allegations with

21     respect to one of the four companies, which is the Sofa Car,

22     which is in request number eight.  And they've made a claim --

23     and I think their view is as long as they say that they've

24     alleged something, that they're entitled to get every document

25     there is on it.  And that's their basis for saying they're

E9oereac

1   entitled to documents relating to Sofa Car going all the way

2   back to 2004.

3          But the other -- nine, ten and eleven, which asks for

4   documents relating to three other companies, there has been no

5   suggestion whatsoever in these depositions that these companies

6   have -- that there's any reason to request this information

7   from them.  So that would be under the consulting fees.  I

8   think three out of the four with respect to Sofa Car we also

9   think that going back, you know, to 2004 is not appropriate and

10  is not relevant to what's going on in Luxembourg.

11         The second category that jumps out are the rebates.

12  Those are requests 12 through 15.  And they're asking for all

13  documents, agreements, cancelled checks, evidence of payment,

14  e-mails back and forth, annual sales with respect to rebates

15  given to a group of companies, including Kohls and Wal-Marts

16  from 2004 to the present.  And my understanding is -- and I

17  think this is typical of the way that the requests are done and

18  the way that all the discovery's been done in this case so

19  far -- is that they have a suspicion that way back when, Roland

20  Lorie, who's not here -- he's over in Luxembourg -- he's not my

21  client -- received some money, kickbacks as it were, in

22  connection with certain rebates.

23         So what they've done is they asked for ten years'

24  worth of information with respect to rebates, rather than

25  framing a request saying, you know, please provide us with any

E9oereac

1    documents showing the payment of any funds relating to rebates

2    through Roland Lorie.  So to pull together all this information

3    would really be very, very burdensome and difficult.

4              THE COURT:  I'm sorry.  Lorie is L-O-R-I-E?

5              MR. EISEMAN:  Right.

6              THE COURT:  And are you suggesting that there's a way

7    that this could be framed that would be preferable?

8              MR. EISEMAN:  Yes.  First of all, just to say it -- I

9    won't say it again after this -- you know, I mean, if they

10   would limit it to a reasonable period of time, which I think is

11   all they can claim is reasonable with respect to the Luxembourg

12   proceeding, and say any documents from 2011 on that reflect in

13   any way payments to Roland Lorie from or in connection with any

14   rebates provided by IGI, then, fine, then that goes to what

15   they're claiming in Luxembourg in a direct way.

16             But to say to give us all of the documents over a

17   ten-year period without any -- just all the agreements, the

18   payments, the e-mails, the annual sales, I mean, it's not

19   targeted at all.  And it's just going to be a huge, a huge

20   burden.

21             Another category that jumps to mind -- and after this

22   I'll stop, because I think I'm making the point generally -- is

23   they've got two requests relating to Mr. Ehrenwald -- he's the

24   CEO of IGI -- relating to his use of automobiles purchased by

25   IGI.  That's number 21 and 22.  You know, this is designed to

E9oereac

1    make Mr. Ehrenwald -- punish Mr. Ehrenwald, essentially.  The

2    information about Mr. Ehrenwald's use of the cars was testified

3    to at the deposition.  There's no dispute that in 2005 the

4    company purchased a Bentley and that Mr. Ehrenwald drove it.

5    He testified to that.  There's no dispute that he has cars now

6    that were paid for by IGI.  There was testimony about that

7    yesterday.

8            And so without any time limit whatsoever, they posed

9    two questions asking for all documentation relating to the

10   purchase and the sale of any car that Mr. Ehrenwald has ever

11   used.  This has nothing to do with what's going on in

12   Luxembourg.  And I think I expressed it in the letter to your

13   Honor.  You know, I do have concerns about what the ulterior

14   motive for this is, because there's been some very inflammatory

15   e-mails back and forth from Mr. Browner or to Mr. Ehrenwald.

16   So those are the three -- you know, if I have to pick three

17   that stand out, those are three that stand out.

18           THE COURT:  Well, counsel, I appreciate what you did,

19   but you didn't pick three items; you picked three categories

20   with many more than three items.

21           MR. EISEMAN:  Right.  Well, I didn't think you limited

22   me to three items but -- did you?  If you did, I apologize.  I

23   have them in categories, which is why I did it that way.  So I

24   don't mean that there are three items; I mean there are three

25   categories.

E9oereac

1          THE COURT:  In any event, so, Mr. Dreyfuss, let's

2     take -- even though I asked for three of the paragraphs or

3     items and we instead got three categories, let's take that

4     first category, paragraphs 9 through 11.  I think there's a

5     concession on 8 as relevant, although there's a disagreement

6     with respect to the time frame.

7          So let me deal first, before we get to the time frame,

8     with the basis for asking for the consulting fees paid to the

9     entities in 9, 10 and 11.

10          MR. DREYFUSS:  Your Honor, I just want to get situated

11     so that you understand, because Mr. Eiseman's suggestion is

12     that this is simply a nonparty here.  The allegations in

13     Luxembourg are that Mr. Ehrenwald in his operation of IGI was

14     working in conjunction with Mr. Lorie to skim money from IGI in

15     order for it to be put in Mr. Lorie's pocket to the detriment

16     of the shareholder Vason, which is jointly owned by Lorie and

17     Browner.  So that what we are generally looking for here are

18     ways in which money came out of IGI New York and looking to see

19     the extent to which there was a quid pro quo and money came

20     back to Mr. Ehrenwald to compensate him as a shareholder of IGI

21     New York for the money that was taken away.  So that's the

22     overall context that we're looking at these in.

23          With regard to the consulting fees, all of those names

24     in 8 through 11 come from a document which we were able to find

25     that was labeled as Exhibit JE6 at Mr. Ehrenwald's deposition.

E9oereac

And this document shows by date and recipient, and then I have a descriptive memo, and then an amount, the outgoing payments out of IGI New York characterized by IGI New York as consulting fees for a period that begins on June 30, 2004, and runs through December 23, 2013.

With regard to category 8, Sofa Car, we asked Mr. Ehrenwald, as well as the chief financial officer of the company, Mr. Li, if they could tell us who Sofa Car was, what services they were rendering to IGI New York and what these payments were for.  And in both instances, both the CEO and the CFO said they had no idea who Sofa Car was and could not tell us what the payments were for.  So that's the basis for looking into this at the deposition and, therefore, the need we have, having failed to get any information about it at the deposition, to get the documentary information.

And Mr. Eiseman may have misspoken, but we don't ask for documents with regard to Sofa Car going all the way back to 2004 in the way that he said.  We asked for three years of documents from 2004 to 2007, because those are the years that their payments to Sofa Car are reflected on Exhibit JE6.  So that's narrowly targeted to what we are seeking.

With regard to Browdy Copeland and the two Chinese names that are in 10 and 11, those periods of time are also keyed to the dates of the payments that were made to those entities, according to Exhibit JE6.  That's the basis of it.

E9oereac

1          And as far as the link to the Luxembourg case, the

2     Luxembourg case specifically seeks an audit of the activity of

3     the various subsidiaries of the IGI group owned by various

4     holding companies owned respectively by Mr. Browner and

5     Mr. Lorie.  And the order of the Luxembourg court, which was

6     originally issued in this case and which is the subject of the

7     proceeding on October 6th, specifically named a provisional

8     director and directed him to conduct such an audit over that

9     ten-year period.

10          So, once again, though this court might consider ten

11     years to be a long time if the litigation were pending here,

12     the instruction of the Second Circuit is that the courts here

13     are not supposed to inquire into the admissibility of the

14     information in the foreign proceeding but simply to look at its

15     relationship to the foreign proceeding and the extent to which

16     its production serves the twin aims of the statute; that is to

17     say, providing information for the foreign proceeding and also

18     encouraging the foreign jurisdiction to cooperate with American

19     parties that seek similar information.

20          The amounts in the other consulting fees, the ones in

21     9, 10 and 11, are very large numbers.  And some of them, indeed

22     most of them, indicate specific invoice numbers which would

23     appear from JE6 justify the payments.  And based on the

24     deposition that we had yesterday of Ms. Nairn, there is nothing

25     magic about the three-year period.  She said that there isn't a

E9oereac

1    particular time period after which they send things to storage,

2    but when they do send things to storage, they put them in boxes

3    and they clearly label the boxes with what's inside.  And if

4    they ever need to get those things back from storage, there is

5    a person who works for IGI and spends part of her time in

6    New York and part of her time at the warehouse in Connecticut,

7    and they ask her to obtain it and the box comes back.

8           So it's a fairly classic storage scheme, so I don't

9    see that this is going to require an enormous amount of burden.

10   But in any event, particularly with regard to number eight,

11   which is the one that there was an inability to provide

12   evidence about at deposition, but also with regard to the other

13   three, because of the size, very large size of the amounts in

14   question, I don't see why it's unduly burdensome for those to

15   be produced.

16          THE COURT:  So, Mr. Eiseman, help me understand.  With

17   respect to Sofa Car, do you know what those consulting fees

18   were for?

19          MR. EISEMAN:  Do I know?

20          THE COURT:  Yes.

21          MR. EISEMAN:  I do not know.

22          THE COURT:  And how about the entity identified in

23   paragraph 9?

24          MR. EISEMAN:  Off the top of my head, all I can say,

25   your Honor, is there was testimony at the depositions about

E9oereac

what each of the -- at Mr. Li's deposition about what each of

these other entities did.  They were involved in design or, you

know, something else.  But they asked questions of Mr. Li with

respect to Sofa Car.  I believe that Mr. Dreyfuss is correct

that they don't identify with respect to the four; with respect

to the other three, Mr. Li testified as to what kind of

services they provided.

          So I don't see -- they're just guessing based on the

size of the payments, but, I mean, I do believe that that's a

fishing expedition.

          If I could just address the two other points that

Mr. Dreyfuss made, your Honor?

          THE COURT:  I had a couple more questions.

          With respect to these consultants, let's take the

consultant listed in paragraph nine, Browdy Copeland, Inc.  Is

there going to be a file related to that consultancy?

          MR. EISEMAN:  I don't know, your Honor.  This relates

to what Mr. Dreyfuss was saying about what goes into the

warehouse.

          Here's the information that I've learned, both at the

deposition yesterday and afterwards, talking to the file person

at IGI.  So there are thousands of, apparently, trans file

boxes of IGI documents in this warehouse; not a master list or

anything like that of what's in the boxes.  The way it works is

each individual employee who works in a particular area is

E9oereac

1   responsible for sending their documents to the warehouse, and

2   each individual employee either labels them, you know,

3   according to what that employee knows or thinks is an

4   appropriate way to do it, but each one has a different process

5   of doing that.  And the way that the files are stored in the

6   warehouse is by the employee who sent them and not by any

7   particular category.  So the warehouse person could not answer

8   questions as to, you know, what would be involved with respect

9   to any particular document, because she herself is not familiar

10  with the documents, other than to say, you'd have to go and

11  find the employee who was involved and then see how they were

12  labeled and retrieve the boxes.  Then the boxes would have to

13  be brought back and searched, and the documents would have to

14  be found and they'd have to be produced.  So, you know, I think

15  that's what I know about the warehouse situation.

16          MR. DREYFUSS:  Your Honor, may I be heard on that

17  particular point?  Stephen Dreyfuss.

18          THE COURT:  Yes.

19          MR. DREYFUSS:  With regard to that point, the

20  testimony of Ms. Nairn yesterday was that there are various

21  functional responsibilities within IGI New York so that there

22  are people who are responsible for accounts payable, there are

23  people who are responsible for accounts receivable.  In this

24  event, since these fees were payable to IGI, presumably it

25  would not be difficult to identify the person who is

E9oereac

1    responsible for these payables, which my understanding is

2    indeed Ms. Nairn, in the sense that she writes the checks for

3    the company.  Therefore, that person, given the scenario that

4    Mr. Eiseman just related, would be the person who would send

5    documents relating to payables to storage, and, therefore, they

6    could be traced in that way.

7            MR. EISEMAN:  That's speculation, your Honor.  I

8    really don't know.

9            THE COURT:  Is that Mr. Eiseman?

10           MR. EISEMAN:  I don't know, but that's certainly not

11   clear from Ms. Nairn's testimony.  It's certainly not clear

12   from what the warehouse person says.

13           THE COURT:  Okay.  Well --

14           MR. EISEMAN:  May I address that?  Just one other

15   point, your Honor?

16           THE COURT:  Mr. Eiseman?

17           MR. EISEMAN:  Yes.  Sorry.  This is David Eiseman.

18           May I address one other point, your Honor?

19           THE COURT:  Yes.

20           MR. EISEMAN:  Since the first time that we appeared

21   before your Honor, the mantra on the other side has been that

22   in the Luxembourg proceedings the court ordered that the

23   provisional director would conduct an audit going back ten

24   years.  So that's based on an ex parte order that was entered

25   in Luxembourg, which still to this day they have not had the

E9oereac

1  hearing to challenge it, even though when we were in front of

2  your Honor in August we were told that hearing would be on

3  September 3rd.  Now it's October 6th.  They still haven't had

4  that hearing.

5          And more significantly I think, your Honor, the order

6  tells the provisional director what to do.  I mean, the

7  question in Luxembourg is, should there be a provisional

8  director, and then the court there tells the provisional

9  director what to do.

10          Mr. Dreyfuss doesn't represent the provisional

11  director.  He's not conducting the audit.  If the provisional

12  director is sustained as a result of the hearing on October 6th

13  or whenever it happens, then the provisional director is going

14  to have to take steps to go ahead and get documents and conduct

15  whatever audit the Court over there tells him to do.  But for

16  Mr. Dreyfuss to go and get all these documents, that's not the

17  proceeding in Luxembourg.

18          So, I mean, the whole argument about this is what's

19  involved in Luxembourg.  I don't think it is.  And we looked at

20  the papers.  We were in front of your Honor.  What's involved

21  there is they're saying that Vason has mismanaged IGI and,

22  therefore, there should be a provisional director, and that

23  provisional director should look into XYZ.  If that's what the

24  Court over there decides, fine, then a provisional director

25  will look into XYZ.  But they will have presumably some kind of

E9oereac

1    standing to say he stands in the shoes of a shareholder, but

2    that's not the case now.

3              MR. DREYFUSS:  Your Honor, Stephen Dreyfuss.

4              THE COURT:  Okay.  Counsel.

5              MR. DREYFUSS:  As counsel indicates now --

6              THE COURT:  Counsel --

7              MR. DREYFUSS:  Because until further order of the

8    Luxembourg court, the provisional director does stand in the

9    shoes of the shareholder Vason for all purposes, unless that's

10   undone by the Court.

11             But more importantly, addressing what Mr. Eiseman just

12   said, the purpose of the proceeding on October 6th is to

13   address whether or not the initial order of the Luxembourg

14   court was well founded.  And that requires under Luxembourg

15   procedure that we present evidence to the Court to substantiate

16   the allegations that were in the Luxembourg complaint that

17   resulted in the initial order appointing the provisional

18   director.  And the allegations that were in the Luxembourg

19   complaint are about a number of instances in which the

20   allegation is that IGI was mismanaged in order to have money

21   skimmed out of it for the benefit of Lorie and to the prejudice

22   of the other shareholder of Vason, which is Mr. Browner.

23             So the resulting order was based on those allegations,

24   and it's those allegations that we are called upon to

25   substantiate on the return date in Luxembourg, which is why

E9oereac

1    we're looking for the documents that will substantial it.

2              THE COURT:  So, Mr. Dreyfuss, we're going to to finish

3    with this category.  So a couple quick questions.

4              The document that you're referring to, JE6, does it

5    list all the consulting fees paid to each of these entities per

6    year?

7              MR. DREYFUSS:  It lists them -- it lists consulting

8    fees from June 30, 2004, to December 23, 2013, for a number of

9    entities, including all of these entities.

10             THE COURT:  Well, do you have any reason to believe

11   it's incomplete with respect to these four entities?

12             MR. DREYFUSS:  I don't know, your Honor.  And more

13   importantly, with regard to each of these entities, there is an

14   invoice -- there are one or more invoice numbers which,

15   according to the testimony we had from Ms. Nairn yesterday, who

16   writes the checks and sends the wire transfers, these aren't

17   approved unless there is sufficient backup so that she and

18   Mr. Ehrenwald can approve it and then send them.  So it's that

19   backup that I'm looking for, particularly because Mr. Ehrenwald

20   and Mr. Li were unable to tell us what services this was for.

21             And, yes, it's our suspicion that this was used as a

22   vehicle to get money out of IGI and transfer it to this Swiss

23   company Sofa Car.  And we're trying to find out what happened

24   to that money after that.

25             So in the absence of an ability by IGI to show what

E9oereac

 1    the services were, it raises an issue which we want to pursue.

 2    And it would not be a difficult matter, it seems to me, for

 3    them to obtain the specified invoices, the relevant invoices

 4    that are the backup that was required for each one of these

 5    substantial wire transfers and provide that.  It's not going to

 6    be a large volume of documents, as far as I can tell.

 7            THE COURT:  And how many invoices do you think are

 8    implicated?

 9            MR. DREYFUSS:  Well, I mean, just looking at Sofa Car,

10    I mean, maybe we're talking about -- looking at all three --

11    all of these entities together, from 8 to 11, maybe 20 or 30

12    invoices, something along those lines.  I haven't counted them

13    all up, but we're not talking about a huge volume of documents.

14            THE COURT:  So we will narrow items 8 through 11 to

15    production of the invoices and the backup attached to the

16    invoices.

17            MR. DREYFUSS:  Okay.  Thank you, your Honor.

18            THE COURT:  So now let's go to items 12 to 15, the

19    next category, and these are connected with rebates.  Twelve is

20    each rebate agreement with identified entities.  Thirteen is

21    documents reflecting payments of the rebates to these entities.

22    And fourteen is e-mails and correspondence concerning the

23    rebates.  And fifteen is documents showing the volume of sales

24    to each of them.

25            Let me start at 15.

E9oereac

1          Mr. Eiseman, I assume there's some kind of general

2     ledger or yearend statement that reflects the annual sales to

3     each of the following entities listed in 15, is that right?

4          MR. EISEMAN:  My understanding is that there is, with

5     respect to certain of the more recent years, but because the

6     accounting program that IGI uses was changed, I think in

7     about -- I think the testimony was sometime around 2007; I'm

8     sure Mr. Dreyfuss will correct me if I'm wrong -- that it's not

9     clear whether there's any information on the accounting system

10    that goes back before that date.

11         MR. DREYFUSS:  I believe, your Honor -- Stephen

12    Dreyfuss -- it was 2005.  And obviously he can only produce

13    what exists.  I recognize that.

14         THE COURT:  Okay.  So we're going to talk about

15    readily accessible, which will be 2005 or 2007.  So with

16    respect to item 15, give the yearend figures for each year,

17    which is readily accessible for each of those entities.

18    Similarly, number 13 -- and I know I'm skipping -- number 13,

19    there should be a yearend ledger with respect to a total of the

20    rebates paid during the course of the year.  So I think that

21    takes care of two of the categories.

22         MR. DREYFUSS:  Excuse me, your Honor.  That would be

23    by entity, correct?

24         THE COURT:  Yes.

25         MR. DREYFUSS:  Thank you.

E9oereac

1          THE COURT:  And is that Mr. Dreyfuss speaking?

2          MR. DREYFUSS:  I beg your pardon.  It was.  Stephen

3     Dreyfuss.

4          THE COURT:  So that leaves us with rebate agreement.

5          And, Mr. Eiseman, were there written rebate agreements

6     with these entities?

7          MR. EISEMAN:  Yeah.  I mean, there are certain rebate

8     agreements, the ones that would have been in effect more

9     recently that are hard copies that are actually, I understand,

10    in the IGI offices.  But going back from ten years, whatever is

11    in the office, in the office prior to that time, I don't know

12    if there are or where they would be located.

13         THE COURT:  You don't have to search the warehouse.

14    Produce those with respect to paragraph 12 that are in the

15    offices; that is, those rebate agreements with those entities

16    that you don't have to do a warehouse search for.

17         That leaves us with item 14, which is e-mails and

18    correspondence concerning rebates.  What kind of search can be

19    done to obtain that, Mr. Eiseman?

20         MR. EISEMAN:  There is an e-mail system.  Also,

21    because it doesn't go back to 2004, my understanding is, but

22    presumably a search can be done for the names, Jerry Ehrenwald

23    and Roland Lorie and the word rebates.  I don't know, it may

24    well be that that returns an awful lot of documents because the

25    rebates are a part of how they do business.  They do business

E9oereac

with very big companies.  And when big companies give them a

certain amount of volume, they provide rebates.  So this is an

ongoing thing of the way they do business.  So the quantity of

that could be voluminous, but it can be searched for within the

system and in-house.  It's just a question of what's going to

be involved in getting the responsive documents out of that.

THE COURT:  Okay, good.  So can you give a report to

plaintiff's counsel by Tuesday with respect to number of hits

for that kind of search, but that would further be narrowed to

a search that would include only the listed names, of course

each ones singularly; for instance, that search that also

includes Sterling.  Great.

MR. EISEMAN:  I understand.  I think those are some of

the bigger customers, but I understand what your Honor is

saying.

THE COURT:  Okay.  Good.  And if there is a

correspondence file broken down by customer, if it's organized

that way, then you should do a search there, too.  But if it's

not, if it's just a chronological correspondence file, you

don't need to do -- I'm talking about hard copy

correspondence -- you don't need to search that.

And the last series was 21 and 22, having to do with

the automobiles.

So, Mr. Dreyfuss, the point there was you have

testimonial admissions.  Why do you need the documents?

E9oereac

1          MR. DREYFUSS:  Your Honor, I will, in the spirit of

2     moving this along, abandon those two requests.

3          THE COURT:  So, counsel, I'd like you to be guided by

4     our discussion of these three categories.  See if you can be

5     practical about responding to the other requests, and if you

6     have any problem, I'll expect to hear from you on Monday or

7     Tuesday.

8          MR. DREYFUSS:  Your Honor, may I just impose upon you

9     one more moment.

10          THE COURT:  Is this Mr. Dreyfuss?

11          MR. DREYFUSS:  There is one area that I think it would

12     be helpful to dispose of now, or at least make the effort to,

13     and that has to do with request 23 and 24 with regard to

14     charitable contributions in very substantial amounts that were

15     made to a charity called Friends of Mosdot Gur, M-O-S-D-O-T,

16     then another word, G-U-R.  That was the area in which when we

17     requested Mr. Ehrenwald at deposition, he invoked his

18     Fifth Amendment right.  So we were not able to get any

19     information about that.

20          Since, of course, IGI Inc. doesn't have

21     Fifth Amendment rights, I think we have demonstrated a need for

22     the relevant documents underlying those contributions.  And I

23     would ask your Honor to direct that those be produced.

24          THE COURT:  That was Mr. Dreyfuss?

25          MR. DREYFUSS:  Sorry.  I beg your pardon.  Thank you.

E9oereac

            MR. EISEMAN:  It's David Eiseman, your Honor.

            Our position on this is the same:  That to go

searching through the warehouse to find -- there's no time

limit on this.  If your Honor is ruling that any information,

any hard copies or any electronic documents that are in the

office that are responsive to these things, should be produced,

then fine.  But if it means going to the warehouse and looking

back through all time, history, to see what's there, I think

it's unduly burdensome.

            MR. DREYFUSS:  Your Honor, Stephen Dreyfuss.

            We do have a document similar to JE6.  I don't have --

yes, it's Exhibit CL3 from the deposition of Carol Low, and

that is a similar kind of document to JE6.

            But with regard to charitable contributions -- and it

specifically lists the dates and amounts of the charitable

contributions that were said to be made to Friends of Mosdot

Gur.  So we would be willing simply to accept the documents

with regard to those contributions that are listed on that

exhibit.

            MR. EISEMAN:  David Eiseman, your Honor.

            That doesn't respond to the problem that things that

are old are going to be in the warehouse, because their list

goes back to 2004, because that's what they asked to be printed

out.  And that information was provided to them from IGI's

accounting system.

E9oereac

```
 1              So our objection on all these things, your Honor,
 2    really is that to go back that far and search in the warehouse
 3    is just the balance between doing that and imposing a hardship
 4    on IGI and the destruction of a business sortie clause is
 5    just -- it's too burdensome.
 6              MR. DREYFUSS:  Your Honor, Stephen Dreyfuss.
 7              One possible option would be, as is sometimes done in
 8    discovery, is to limit the burden on IGI.  We would be willing
 9    to go to the warehouse and look at the relevant boxes and
10    documents, rather than imposing that burden on IGI.
11              MR. EISEMAN:  Of course they would, your Honor,
12    because then they would be privy to everything they wanted to.
13              Look, our objection is it's going to the warehouse and
14    looking for things ten years old, you know, nine years old,
15    eight years old is very burdensome, particularly given the
16    very, very tenuous relationship between these documents and
17    what they're trying to do here and what they're also trying
18    to -- what happened their claim is in --
19              THE COURT:  Mr. Dreyfuss --
20              MR. DREYFUSS:  Stephen Dreyfuss.
21              We have testimony, for example, from the
22    brother-in-law of Roland Lorie, deposition testimony where he
23    says that on two occasions, at the request of Roland Lorie, he
24    went to IGI's offices and delivered to Jerry Ehrenwald
25    substantial quantities of cash.  I think to suggest that
```

E9oereac

1    Mr. Ehrenwald is totally neutral in all of this -- and this is

2    just a third-party witness who's being oppressed by this

3    burden -- it really doesn't comport with the facts.

4            And now there is a -- Mr. Ehrenwald was questioned

5    with regard to these Mosdot Gur contributions.  They totaled

6    nearly $1 million.  And those are the questions to which he

7    took the Fifth Amendment.  I think there is justification for

8    not only seeking the documentation that may be in their

9    offices, but finding an appropriate way to seek that, to the

10   extent it may exist in storage.  And as I said, we're willing

11   to undertake that burden so that they would only need a minder

12   to watch us and make sure we're not going beyond what we're

13   supposed to look at, rather than go through the boxes.

14           THE COURT:  Mr. Dreyfuss -- counsel, counsel, you

15   can't jump in like that so that I don't have a chance to speak.

16   I'm not going to do another conference by telephone unless we

17   can manage this more comfortably.

18           I've read your letters.  We need to get to the point

19   here.

20           So, Mr. Dreyfuss, if you have a document that lists

21   the charitable contributions to Mosdot Gur, what else do you

22   need?

23           MR. DREYFUSS:  We want to see what the correspondence

24   was and the underlying basis that was involved in

25   substantiating those contributions.  It's fine to say that they

E9oereac

made the contributions, but the question that we asked

Mr. Ehrenwald as to which he took the Fifth Amendment was

whether or not any of that money came back from Mosdot Gur,

either to Mr. Ehrenwald or to IGI, Inc., or to Roland Lorie in

such a way that it was removed from the possession of the

company, IGI, Inc., jointly owned by Mr. Ehrenwald and Vason,

the company which in turn is jointly owned by Browner and Lorie

that -- it went out of IGI, Inc., ostensibly as a charitable

contribution, but then under-the-table moneys came back either

through Mr. Ehrenwald or to Mr. Lorie in compensation for some

efforts that they made to cooperate with Mr. Lorie's efforts.

So from my point of view, the mere fact that they're

made is the predicate for our need for all the other related

documents to see whether there is, as we suspect, evidence that

such things as the delivery of cash to Mr. Ehrenwald by

Mr. Lorie's brother-in-law are a quid pro quo coming back to

Mr. Ehrenwald so that he doesn't suffer by having money taken

out of the company and that only Mr. Browner suffers.  That's

the gist of what we're trying to assert in Luxembourg and what

we're trying to find out here.

THE COURT:  Yes.  Well, will the audit that you hope

will eventually be done get the Luxembourg court access to

these files in the warehouse?

MR. DREYFUSS:  Well, I don't know.  Somehow I suspect

that we will be here talking to Mr. Eiseman again in the event

E9oereac

1   that that happens and hearing about the burden on complying

2   with such a request, but I can't predict.  The problem I have

3   is that in order for that audit to take place, we have to be

4   able to sustain the order appointing a provisional director in

5   Luxembourg.  And in order to sustain that, we have to show some

6   evidence of the well-foundedness of the allegations that we

7   made.  And that's why we're seeking the discovery here, which

8   is what the purpose, of course, of 1782 is.

9           THE COURT:  Well, Mr. Dreyfuss, I don't really

10  understand what the search described in 24 would entail.  If

11  there is a cash kickback, I'm not sure that documents

12  reflecting that are going to be readily found anywhere or how

13  one would conduct a search for it.  If you're talking about

14  receivables and a year-end ledger identifying Friends of Mosdot

15  Gur as a correspondent on that, I would give you that access.

16          With respect to contributions made by IGI as reflected

17  in request 23, I'll require the search of readily accessible

18  documents but not the warehouse at this point.  I'm conscious

19  of the fact that there's an October 6th hearing date, so I'm

20  trying to order things that can be achieved by that date and,

21  therefore, beneficial to the use described by Mr. Dreyfuss.

22          Thank you, counsel.  Good luck.

23          MR. EISEMAN:  Your Honor, I have one question of

24  clarification with respect to your ruling.

25          THE COURT:  Mr. Eiseman?

E9oereac

1          MR. EISEMAN:  May I, your Honor?

2          THE COURT:  Yes.

3          MR. EISEMAN:  You ruled with respect to numbers 8

4    through 11 that we should produce the invoices in the backup

5    attached.  I didn't understand whether that meant we were

6    required to go to the warehouse or not to retrieve those.

7          THE COURT:  Yes, you are.

8          MR. EISEMAN:  Okay.

9          THE COURT:  Thank you so much, counsel.

10          MR. EISEMAN:  Thank you, your Honor.

11          (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25